PENNSYLVANIA RAILROAD COMPANY & Others *v.*
ST. LOUIS, ALTON & TERRE HAUTE RAILROAD
COMPANY.

ST. LOUIS, ALTON & TERRE HAUTE RAILROAD
COMPANY *v.* PENNSYLVANIA RAILROAD COM-
PANY & Others.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF INDIANA.

Argued January 14, 15, 1886.—Decided April 26, 1886.

When an existing railroad corporation, organized under the laws of one
State, is authorized by the laws of another State •to extend its road
into the latter, it does not become a citizen of the latter State by exercising
this authority, unless the statute giving this permission must necessarily be
construed as creating a new corporation of the State which grants this per-
mission.

Where a lease of a railroad for ninety-nine years contained covenants for the
payment of monthly instalments of rent, to keep the road in repair, and to
keep accounts of all matters connected with its business, as affecting the
amount of rent to be paid, which covenants were guaranteed by other par-
ties than the lessee, a bill which shows failure to pay rent, depreciation of
the road, and combination of the guarantors and lessee to divert the earn-
ings of the road to the benefit of the guarantors, presents a case of equitable
jurisdiction when it prays for specific performance of the obligations of the
lease.   In such a case a suit at law on each instalment of rent as it falls
due is not an adequate remedy.

Unless specially authorized by its charter, or aided by some other legislative
action, a railroad company cannot by lease or other contract turn over to
another company for a long period of time its road and all its appurtenances,
the use of its franchises, and the exercise of its powers, nor can any other
railroad company, without similar authority, make a contract to run and
operate such road, property, and franchises of the first corporation.   Such
a contract is not among the ordinary powers of a railroad company, and is
not to be inferred from the usual grant of powers in a railroad charter.
*Thomas* v. *Railroad Co.*, 101 U. S. 70, reaffirmed.

The act of the Illinois legislature of February 12, 1855, is a sufficient authority
on the part of the St. Louis, Alton & Terre Haute Company to make the
lease sued on in this case.

But if the other party to the contract, the Indianapolis and St. Louis Com-
pany, had no such authority, the contract is void as to it; and if the other

companies had no power to guarantee its performance, it is void as to them, and cannot give a right of action against them.

An examination of the statutes of Indiana and of the decisions of its courts fails to show, in the one or the other, any authority for an Indiana railroad company to make such a contract as that between the principal contracting companies in this case.

Nor is any authority found in the charters of any of these guaranteeing companies, or of the laws of the States under which they are organized, to guarantee the performance of such a contract as this; the parties to it and the road which it relates to being outside the limits of these States, and having no direct connection with their roads.

The doctrine is sound that when acts have been done and property has changed hands under void contracts which have been fully executed, courts will not interfere; but relief in such cases must be based on the invalidity of the contract, and not in aid of its enforcement. While the plaintiff in this case might recover in an appropriate action the rental value of the use of its road against the lessee company, the other defendants who had received nothing, but had been paying out money under a void contract, cannot be compelled to pay more money under the same contract.

This was a bill in equity to enforce specific performance of a contract of lease of a railway, and contracts of guarantee. Cross appeals from the decree below. The case is stated in the opinion of the court.

*Mr. John M. Butler* and *Mr. Joseph E. McDonald* for St. Louis, Alton & Terre Haute Railroad Company, appellant in the second case and appellee in the first, made the following citations to such of the points made by counsel as are decided in the opinion of the court.

I. *St. Louis, Alton & Terre Haute Railroad Co.* v. *Miller*, 43 Ill. 199; *Railroad Co.* v. *Harris*, 12 Wall. 65; *Railway Co.* v. *Whitton*, 13 Wall. 270; *Insurance Co.* v. *Morse*, 20 Wall. 445; *Steamship Co.* v. *Tugman*, 106 U. S. 118; *Memphis & Charleston Railroad Co.* v. *Alabama*, 107 U. S. 581; *Bank of Augusta* v. *Earle*, 13 Pet. 519; *Railroad Co.* v. *Koontz*, 104 U. S. 7; *Canada Southern Railroad Co.* v. *Gebhard*, 109 U. S. 527; *Muller* v. *Dows*, 94 U. S. 444; *Chicago & Northwestern Railroad Co.* v. *Chicago & Pacific Railroad Co.*, 6 Bissell, 219; *Williams* v. *Missouri Kansas & Texas Railroad Co.*, 3 Dillon, 267; *Baltimore & Ohio Railroad Co.* v. *Gallahue*, 12 Gratt. 655.

II. and III. *Pittsburgh, Cincinnati & St. Louis Railway Co.*

v. *Columbus Chicago & Indiana Central Railway Co.*, 8 Bissell, 456 ; *Tippecanoe County* v. *Lafayette, Muncie & Bloomington Railroad Co.*, 50 Ind. 85 ; *Pittsburgh, Cincinnati & St. Louis Railway Co.* v. *Kain*, 35 Ind. 291 ; *Huey* v. *Indianapolis & Vincennes Railroad Co.*, 45 Ind. 320 ; *Railroad Co.* v. *Vance*, 96 U. S. 450 ; *Archer* v. *Terre Haute & Indianapolis Railroad Co.*, 102 Ill. 493 ; *Railway Co.* v. *McCarthy*, 96 U. S. 258 ; *Railroad Co.* v. *Pratt*, 22 Wall. 123 ; *Green Bay & Minnesota Railroad Co.* v. *Union Steamboat Co.*, 107 U. S. 100 ; *Hitchcock* v. *Galveston*, 96 U. S. 341 ; *Attorney General* v. *Great Eastern Railway Co.*, 5 App. Cas. 473 ; *South Yorkshire Railway Co.* v. *Great Northern Railway Co.*, 9 Ex. 55 ; *Great Northern Railway Co.* v. *South Yorkshire Railway Co.*, 9 Ex. 642 ; *Smead* v. *Indianapolis, Pittsburgh & Cleveland Railroad Co.*, 11 Ind. 104; *State Board of Agriculture* v. *Citizen's Street Railway Co.*, 47 Ind. 407 ; *Low* v. *Central Pacific Railway Co.*, 52 Cal. 53 ; *Stewart* v. *Erie Transportation Co.*, 17 Minn. 372, 373 ; *Zabriskie* v. *Cleveland, Columbus & Cincinnati Railroad Co.*, 23 How. 381 ; *Railroad Co.* v. *Howard*, 7 Wall. 392, 413 ; *Board, etc.* v. *Lafayette, etc. Railroad Co.*, 50 Ind. 85 ; *Flagg* v. *Manhattan Railway Co.*, 20 Blatchford, 142 ; *Hoyt* v. *Thompson's Executor*, 19 N. Y. 207 ; *Van Hostrup* v. *Madison*, 1 Wall. 291.

IV. *San Antonio* v. *Mehaffey*, 96 U. S. 312 ; *Railway Co.* v. *McCarthy*, 96 U. S. 258 ; *Hitchcock* v. *Galveston*, 96 U. S. 341 ; *National Bank* v. *Graham*, 100 U. S. 699 ; *Daniels* v. *Tearney*, 102 U. S. 415 ; *Gold Mining Co.* v. *National Bank*, 96 U. S. 640 ; *National Bank* v. *Matthews*, 98 U. S. 621 ; *Township of Pine Grove* v. *Talcott*, 19 Wall. 666 ; *Oil Creek & Allegheny Railroad Co.* v. *Penn. Trans. Co.*, 83 Penn. St. 160 ; *Woodruff* v. *Erie Railway Co.*, 93 N. Y. 609, 615 ; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62 ; *Parish* v. *Wheeler*, 22 N. Y. 494 ; *Behler* v. *German Mutual Fire Ins. Co.*, 68 Ind. 347 ; *Pancoast* v. *Travelers' Ins. Co.*, 79 Ind. 172 ; *Bradley* v. *Ballard*, 55 Ill. 413 ; *Chicago Building Society* v. *Crowell*, 65 Ill. 453 ; *Darst* v. *Gale*, 83 Ill. 136 ; *Hamilton Hydraulic Co.* v. *Cincinnati, Hamilton & Dayton Railroad Co.*, 29 Ohio St. 341 ; *Hays* v. *Gallion Gas Co.*, 29 Ohio St. 330 ; *Newburgh Petroleum Co.* v. *Weare*, 27 Ohio St. 343 ; *Grant* v. *White*, 42 Missouri, 285.

*Mr. Stevenson Burke* for Pennsylvania Railroad Company and others, appellants in the first case, and appellees in the second cited to point III., decided by the court, the following cases: *Lafayette* v. *Cox,* 5 Ind. 38; *Green Bay & Minnesota Railroad Co.* v. *Union Steamboat Co.,* 107 U. S. 98; *Bank of Augusta* v. *Earle,* 13 Pet. 519; *Miners' Ditch Co.* v. *Zellerbach,* 37 Cal. 543; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *Vandall* v. *South San Francisco Dock Co.,* 40 Cal. 83; *Bellmeyer* v. *Marshalltown,* 44 Iowa, 564; *Weckler* v. *First Nat. Bank,* 42 Maryland, 581, *St. Louis* v. *Weber,* 44 Missouri, 547; *Matthews* v. *Skinker,* 62 Missouri, 329; *Brooklyn Gravel Road Co.* v. *Slaughter,* 33 Ind. 185; *East Anglian Railways Co.* v. *Eastern Counties Railway Co.,* 11 C. B. 775; *Ogdensburg & Lake Champlain Railroad Co.* v. *Vermont & Canada Railroad Co.,* 63 N. Y. 176; *Davis* v. *Old Colony Railroad Co.,* 131 Mass. 258; *Troy & Boston Railroad Co.* v. *Boston Hoosac Tunnel & Western Railway Co.,* 86 N. Y. 107; *Hinckley* v. *Gildersleeve* 19 Grant Ch. U. Canada, 212; *Archer* v. *Terre Haute & Indianapolis Railroad Co.,* 102 Ill. 493; *Pearce* v. *Madison & Indianapolis Railroad Co.,* 21 How. 441 and cases cited; *Taft* v. *Pittsford,* 28 Vt. 286; *Franklin Co.* v. *Lewiston Institution for Savings,* 68 Maine, 43; *Rock River Bank* v. *Sherwood,* 10 Wis. 230; *Minor* v. *N. Y. & N. H. Railroad Co.,* 53 N. Y. 363; *Monument Bank* v. *Globe Works,* 101 Mass. 57; *Lafayette Savings Bank* v. *St. Louis Stone Ware Co.,* 2 Missouri App. 299; *Central Bank* v. *Empire Stone Dressing Co.,* 26 Barb. 23; *Madison & Watertown Plank Road Co.* v. *Watertown & Portland Plank Road Co.,* 7 Wis. 59; *Ætna Bank* v. *Charter Oak Life Ins. Co.,* 50 Conn. 167; *Bank of Genessee* v. *Patchin Bank,* 13 N. Y. (3 Kernan) 309; *Woodruff* v. *Erie Railway Co.,* 25 Hun. 246; *Chambers* v. *Falkner,* 65 Ala. 448; *Dowing* v. *Mt. Washington Road Co.,* 40 N. H. 230; *Wiswall* v. *Greenville & Raleigh Plank Road Co.,* 3 Jones Eq. 183; *Toll Bridge Co.* v. *Osborn,* 35 Conn. 7.

*Mr. Ashley Pond* for Lake Shore & Michigan Southern Railway Co., appellant in the first case, and appellee in the second cited the following cases not cited by *Mr. Stevenson*

*Burke:* *Zabriskie* v. *Cleveland, Columbus & Cincinnati Railroad,* 23 How. 381; *Vail* v. *Hamilton,* 85 N. Y. 453; *Rochester Savings Bank* v. *Averill,* 96 N. Y. 467; *Railroad Co.* v. *Howard,* 7 Wall. 392; *State Board* v. *Citizens' Railway Co.,* 47 Ind. 407; *Low* v. *Cent. Pac. Railway Co.,* 52 Cal. 53; *Stewart* v. *Erie Transportation Co.,* 17 Minn. 372.

*Mr. John T. Dye* filed a brief for appellants in the first case and appellees in the second, citing the following cases not cited by Mr. Burke: On the first point in the opinion of the court, *Christian Union* v. *Yount,* 101 U. S. 352: And on the other points, *Wittenton Mills* v. *Upton,* 10 Gray 582; *Richardson* v. *Sibley,* 11 Allen 65; *Ashbury Railway Carriage & Iron Co.* v. *Riche,* L. R. 7 H. L. 653; *Stevens* v. *Rutland &c. Railroad,* 29 Vt. 545; *Danbury & Norwalk Railroad Co.* v. *Wilson,* 22 Conn. 435; *Coleman* v. *Eastern Counties Railway,* 10 Beav. 1; *Bagshaw* v. *Eastern Union Railway,* 7 Hare, 114; *McGregor* v. *Dover & Deal Railway,* 18 Q. B. 618; *Eastern Counties Railway* v. *Hawkes,* 5 H. L. Cas. 331; *Smead* v. *Indianapolis, Pittsburgh & Cleveland Railroad Co.,* 11 Ind. 104; *Marietta & Cincinnati Railroad* v. *Elliott,* 10 Ohio St. 57; *Adkinson* v. *Marietta & Cincinnati Railroad Co.,* 15 Ohio St. 21; *Strauss* v. *Eagle Ins. Co.,* 5 Ohio St. 59; *Peoria & Rock Island Railway Co.* v. *Coal Valley Mining Co.,* 68 Ill. 489; *Railroad Co.* v. *Vance,* 96 U. S. 450.

Mr. Justice MILLER delivered the opinion of the court.

These are cross-appeals from a decree of the Circuit Court for the District of Indiana.

The suit was brought in that court by a bill in chancery, filed by the St. Louis, Alton and Terre Haute Railroad Company, alleging that it was a corporation organized under the laws of the State of Illinois, and a citizen of that State, against the Indianapolis and St. Louis Company, a corporation similarly organized under the laws of the State of Indiana, and a citizen of that State, and against the other corporations mentioned in the bill as citizens of Indiana, or of other States than the State of Illinois.

A final decree was rendered in favor of plaintiff for the sum of $664,874.70, with costs, and an injunction against several of the defendants, from which both complainants and defendants in the court below have appealed.

1. The first question arising on the record is that of the jurisdiction of the Circuit Court of the Indiana district as founded on the citizenship of the parties.

This question was raised at an early stage of the controversy by a distinct plea to the jurisdiction, and was overruled by the court. Afterwards, and before the decree, the defendant corporations who had filed this plea withdrew it, and desired to have the case decided on the merits.

As it is not competent to any parties to confer jurisdiction on the Circuit Court by a waiver of objections to it, the question is one which lies at the threshold of any further proceeding, and must be decided.

The objection arises out of the admitted fact that the Indianapolis and St. Louis Railroad Company is a corporation organized under a statute of Indiana and is a necessary party to the suit, and the assumption that the St. Louis, Alton and Terre Haute Railroad Co. is organized under laws of both Illinois and Indiana, and is, therefore, a citizen of the latter State, as is its principal opponent in the controversy.

The complainant company owns a road extending from the Mississippi River, opposite St. Louis, to Terre Haute, Indiana, of which only a very few miles—ten or twelve—are within the State of Indiana. The controversy grows out of a lease of this road by the complainant company to the Indianapolis and St. Louis Company. As the complainant company was chartered originally by the State of Illinois, and is undoubtedly a citizen of that State, and in that character would have the right to sue the other companies in the Circuit Court for Indiana, do the other facts in the case defeat this right by making it also a citizen of Indiana?

It does not seem to admit of question that a corporation of one State, owning property and doing business in another State by permission of the latter, does not thereby become a citizen of this State also. And so a corporation of Illinois, authorized

by its laws to build a railroad across the State from the Mississippi River to its eastern boundary, may by the permission of the State of Indiana extend its road a few miles within the limits of the latter, or, indeed, through the entire State, and may use and operate the line as one road by the permission of the State, without thereby becoming a corporation or a citizen of the State of Indiana. Nor does it seem to us that an act of the legislature conferring upon this corporation of Illinois, by its Illinois corporate name, such powers to enable it to use and control that part of the road within the State of Indiana, as have been conferred on it by the State which created it, constitutes it a corporation of Indiana. It may not be easy in all such cases to distinguish between the purpose to create a new corporation which shall owe its existence to the law or statute under consideration, and the intent to enable the corporation already in existence under laws of another State to exercise its functions in the State where it is so received. The latter class of laws are common in authorizing insurance companies, banking companies and others to do business in other States than those which have chartered them. To make such a company a corporation of another State, the language used must imply creation or adoption in such form as to confer the power usually exercised over corporations by the State, or by the legislature, and such allegiance as a State corporation owes to its creator. The mere grant of privileges or powers to it as an existing corporation, without more, does not do this, and does not make it a citizen of the State conferring such powers.

In a case where the corporation already exists, even if adopted by the law of another State and invested with full corporate powers, it does not thereby become such new corporation of another State, until it does some act which signifies its acceptance of this legislation and its purpose to be governed by it.

We think what has occurred between the State of Indiana and this Illinois corporation falls short of this.

The origin of this corporation was a special act of the Illinois legislature of January 28, 1851, chartering the Terre Haute and Alton Railroad Company to construct a road from

the State line near Terre Haute to Alton; and by an act of the Indiana legislature, passed a few days later, this Illinois corporation was permitted to extend its road through Indiana to Terre Haute. Some changes took place in the name and power of this company by statutes of Illinois, but none which affected its powers derived from the Indiana statute of February 11, 1851.

But the property of the corporation was sold out under foreclosure of a mortgage to Robert Bayard, Samuel J. Tilden, Russell Sage, and others, who, under an act of the Illinois legislature, reorganized the purchasers into the corporation called The St. Louis, Alton and Terre Haute Railroad Company, which is the present company, and which, by the Illinois statute, succeeded to all the franchises of the original Terre Haute, Alton and St. Louis Company. As these included all the powers necessary to operate the few miles of the road in Indiana under the act of February 11, 1851, it was unnecessary to seek an act of incorporation from that State. It appears, however, that Bayard, Tilden, and their associates, did file in the office of the Secretary of State of Indiana a certificate of the organization of the new company, with the names of the first directors of it who were to serve until 1863; and it is argued that this made the St. Louis, Alton and Terre Haute Company a corporation of the State of Indiana. A critical examination of this certificate renders it very doubtful whether that was its purpose, but rather indicates that it was intended to secure and perpetuate the rights granted to the Terre Haute and Alton Company by the act of February 11, 1851. At all events, no evidence exists of the agreement of the new Illinois company to accept of or act under this attempt at organization under Indiana laws. They never held an election for directors of the Indiana corporation, if one existed, and they never in any other manner recognized the existence of an Indiana corporation of the same name.

Without going into the question whether the plaintiff in' this case, if it were clearly a corporation of both States, could maintain this suit in the Circuit Court under the decisions in this court, we are satisfied that, with reference to its right to

sue as a citizen of Illinois, it is *not*, also, a corporation and citizen of Indiana under the facts found in this record.

As regards the asserted existence of the Indianapolis and St. Louis Company under the law of Illinois, by which it is asserted to be a citizen of the same State with plaintiff, the objection is the same as that which was overruled in *Railway Co.* v. *Whitton*, 13 Wall. 270, and in *Muller* v. *Dows*, 94 U. S. 444.

2. The next objection to the decree is, that the bill does not present a case for equitable relief, and should have been dismissed for want of jurisdiction in chancery.

To understand the force of this proposition clearly, it is necessary to make a statement of the case as made by the bill.

It seems that in May, 1867, the St. Louis, Alton and Terre Haute Railroad Company, plaintiff in the bill, had nearly completed and was operating, from Terre Haute to St. Louis by way of Alton, a road about one hundred and eighty-nine miles long. From Terre Haute to Indianapolis (about seventy miles) a corporation had been organized under the laws of Indiana to build a road, and probably had built the whole or a part of it. Indianapolis was then a railroad centre of importance, from which roads ran to Chicago and other lake towns, and to Louisville, Cincinnati, and other towns on the Ohio River, and to all the principal cities of the Atlantic Coast.

At St. Louis the Terre Haute and Alton road connected with the railroad system west of the Mississippi River.

Several of these railroad companies whose traffic was east of Indianapolis, and all of whom had connection, direct or indirect, with that city, were desirous of reaching St. Louis with their business, and made proposal to the complainant company for the purpose of accomplishing this result. The companies who executed the agreements to secure this purpose, all of whom were made defendants to the bill, were the Indianapolis, Cincinnati and Lafayette Railroad Company, the Pittsburgh, Fort Wayne and Chicago Railway Company, the Pennsylvania Company, the Bellefontaine Company, the Cleveland, Columbus and Cincinnati Company, and the Cleveland, Painesville and Ashtabula Company.

Their proposition was that the Indianapolis and Terre Haute Company should lease, for a period of ninety-nine years, the part of complainant's road between St. Louis and Terre Haute, and thus with its own road make a continuous line between Indianapolis and St. Louis, and the other companies agreed to guarantee the payment of the rent and performance of the other obligations of the Terre Haute and Indianapolis Company. And it was also agreed that if this company refused to execute this operating contract, the defendants might procure some other company to build the seventy miles of road from Indianapolis to Terre Haute, and execute the agreement in place of the Terre Haute and Indianapolis Company, and in like manner they would guarantee the performance of its obligations in the lease.

What occurred was that the Terre Haute and Indianapolis Company refused to execute the contract of lease, and another corporation was organized, under the influence and control of these guaranteeing companies, to build the seventy miles of road between Indianapolis and Terre Haute, and the line of road between Indianapolis and St. Louis was thus made complete. This company was called the Indianapolis and St. Louis Railroad Company, and it executed the contract of lease with the complainant company September 11, 1867. At the same time, the guaranteeing companies, except the Pennsylvania Company, executed a new guaranty as a substitute for the former. The averments of the bill, however, bring in the Pennsylvania Company as defendant, by alleging that, in its lease of the Pittsburgh, Fort Wayne and Chicago road it bound itself to perform the obligation of this latter company as one of the guarantors, and that, by signing the original contract of guaranty for the Terre Haute and Indianapolis Company, it bound itself to the same guaranty for any road substituted in its place, and, by the further averment, that the Indianapolis and St. Louis Company, which did enter into the contract of lease, was in reality but the creature of the companies who signed the original contract of guaranty, the Pennsylvania company included.

This contract of lease between the complainant company

and the Indianapolis and St. Louis Company lies at the foundation of all claim for relief in this suit. It is a carefully drawn instrument of nineteen articles. It leases out complainant's road from St. Louis to Terre Haute, and a short connecting line of four miles to Alton, for the period of ninety-nine years, and it provides for the absolute control of this road by the Indianapolis and St. Louis Company, called party of the first part, during this period; for its being kept in repair by that company; for the payment of a rent by that company to the party of the second part, the St. Louis, Alton and Terre Haute Company, which should be regulated by the gross income derived from the use of the road, but in no event to be less than $450,000 per annum.

Some of these articles of agreement and parts of others important to the issues before us are as follows :

## " Article I.

" The said party of the first part shall, will, and may manage, operate, and carry on the business of a certain railroad belonging to the party of the second part, and known as the principal or main line of the St. Louis, Alton and Terre Haute Railroad, extending from Terre Haute, in the State of Indiana, to East St. Louis or Illinoistown, in the said State of Illinois, and also a certain branch thereof belonging to the party of the second part, and extending from a point on the said main line to Alton, in the said State of Illinois, for and during the period of ninety-nine years from the first day of June, in the present year of our Lord one thousand eight hundred and sixty-seven, upon and subject to the terms and conditions of this indenture, and all and singular the provisions herein contained.

## " Article II.

" The said party of the first part shall, and will, within a reasonable time hereafter, finish and put in good order and condition, any and all unfinished portions of said main line of railroad, or of said Alton branch thereof, and any and all parts or portions of either said main line or said branch which may

be in inferior condition or out of repair; and thereafter, at all times during the said period of ninety-nine years, the said party of the first part, its successors and assigns, shall and will keep the said main line of railroad, and the said Alton branch thereof, in the order and condition of first-class western railroads, making from time to time all needful repairs, replacements, improvements of and additions to the same at the proper cost and expense of the said party of the first part, without deduction or abatement, from the moneys hereinafter provided to be paid to the party of the second part; and the said party of the first part shall and will expend, for improvements and equipments upon the said line of railroad, in addition to the ordinary expenses of operation, repair, and replacement, a sum not less in the aggregate than five hundred thousand dollars before the thirty-first day of December, in the year one thousand eight hundred and sixty-eight.

## "Article III.

" The said party of the first part shall, and may, for and during the term aforesaid, use and apply to and for the business of said main line and branch railroads any and all depots, stations, station-houses, car-houses, freight-houses, wood-houses, and other buildings, and all machine-shops and other shops, and all depot grounds and other lands adjacent to the said main line and branch railroad, or either of them, or used or acquired for use in connection therewith, including certain depot grounds at East St. Louis aforesaid."   . . .

Article V. authorizes the lessee company to fix all rates of fare for freight and passengers, with a provision for the protection of other companies not material here.

## "Article VI.

" The said party of the first part, keeping and performing all and singular the terms, provisions, and conditions of these presents, and making the payments hereinafter required, shall and may, at all times during the period of ninety-nine years aforesaid, demand, collect, and receive any and all fares, charges, freights, tolls, rents, revenues, issues, and profits of

the said main line of railroad extending from Terre Haute to East St. Louis aforesaid, and of the said branch thereof to Alton aforesaid.

## "Article VII.

" The party of the first part shall, in each and every year of the term of ninety-nine years, pay, or cause to be paid, to the party of the second part, in the manner and at the times hereinafter provided, thirty per cent. of the gross earnings of the said railroad from Terre Haute to East St. Louis, and the branch thereof to Alton, until such gross earnings for such year shall amount to the aggregate sum of two millions of dollars, and twenty-five per cent. of any excess over two millions of dollars, until the whole earnings for such year shall amount to three millions of dollars, and twenty per cent. of any excess over three millions of dollars of gross earnings for such year, and such percentage of the gross earnings for each such year shall be paid over without any deduction, abatement, or diminution for any cause whatever; every demand or claim accruing, or to accrue, to the party of the first part being hereby declared to be chargeable on that portion of the gross earnings which the said party is, by the next succeeding article hereof, empowered to retain as therein provided; but it is hereby expressly agreed that the aforesaid payments shall amount, in each and every year, to at least four hundred and fifty thousand dollars, which is hereby agreed upon as a minimum for each and every year, and it is to be paid absolutely, without reference to the percentage which it forms of the gross earnings of such year, and without leaving or creating any claim or charge upon the earnings of any future year."

## "Article XV.

" The said party of the first part shall and will, during the whole period of ninety-nine years aforesaid, keep just, full, and true accounts of any and all business which shall or may be done upon the said main line of railroad, and the said Alton branch thereof, or upon either or any part of either thereof, and of all moneys earned or received from or on account of such business, and shall render to the party of the second part,

monthly during such period, a detailed approximate statement of such business, showing the receipts and disbursements on account thereof, and shall also, annually, to wit, on or before the first day of March in each year, account to and with the party of the second part for any and all moneys earned or received as aforesaid for and during the year terminating with the thirty-first day of December preceding the time of such accounting, and the president of the party of the second part, or an agent duly authorized by the board of directors, shall, at all reasonable hours and times during the term aforesaid, have the right to examine and inspect, and there shall be produced and exhibited to them, any and all books of account wherein shall be entered, or which shall purport to contain, any entry or statement relating to the business done on said main line and branch railroads, or on any part of either thereof during the term aforesaid, and any and all vouchers relating to such business, and shall also have the right to take transcripts from and copies of such entries or statements and of such vouchers."

The following is the contract of guarantee, signed by the other railroad companies on the same day that the foregoing lease was signed by the two principal companies. The reference to the operating contract of the 17th May, 1867, being to the one prepared for the Indianapolis and Terre Haute Company which it refused to execute. The recitals are omitted, and only the language descriptive of the contract of guarantee is given:

"Now, therefore, this indenture witnesseth, That for and in consideration of the premises, and of the sum of one dollar to each of them duly paid, the receipt whereof is hereby acknowledged, the said parties of the first, second, and third parts to these presents, for themselves, their successors and assigns, have covenanted, promised, and agreed, and by these presents do covenant, promise, agree, and guarantee to and with the said party of the fourth part, its successors and assigns, that the said Indianapolis and St. Louis Railroad Company shall and will at all times hereafter keep, observe, and perform all and singular the covenants, conditions, and provisions of the said operating contract, bearing date on the 17th day of May, in the year

of our Lord 1867, and of the said instrument bearing even date herewith, by which the said Indianapolis and St. Louis Railroad Company has assumed, adopted, or become liable to carry out the said operating contract according to the true intent and meaning thereof : *Provided, nevertheless,* That all the obligations of the parties of the first, second, and third parts hereto, created or intended to be created hereby, shall be several and not joint, and as to each of them for the equal third part of any and all damages which may arise from any default of the said Indianapolis and St. Louis Railroad Company, its successors or assigns in the premises, or for any breach of this agreement by the said parties of the first, second, or third parts thereto."

The bill charges, as violations of the contract of lease, that the Indianapolis and St. Louis Company has for some time past failed to pay the rent as fixed at the minimum of $450,000 per annum ; that it is insolvent, and is in many other respects in default in regard to its obligations under the operating contract ; that it has not kept the road adequately furnished with equipments, but has allowed it to run down and depreciate, and has resorted to the use of leased cars and equipments, instead of purchasing and owning the same ; that the road is not in the order and condition of a first-class western road, as required by said contract ; that the money which should go to pay complainant is used to pay for the leased cars ; and that the rails have become worn and the track out of repair. It is also alleged that the lessee's road is covered by a large mortgage, to secure bonds held chiefly, if not altogether, by the guaranteeing companies, and, in fact, by means of their ownership of the stocks and bonds of that company, they are drawing from it the money which should go to pay complainant's rent and to purchase rolling-stock and repair the road. It is then alleged that suits for the instalments of rent as they fall due, and judgments at law against all the defendants, would be no adequate remedy. That to do this, or resume possession and control of complainant's road for non-performance, would not be sufficient for that purpose. That complainant has a contract with the defendants more valuable than would be the resumption of the

possession of the road in its depreciated condition, both in respect to the road and equipments and the traffic over it, so largely diminished by construction of the road of the Indianapolis and St. Louis Company to the Mississippi River at St. Louis by that company, and by the other defendants, on a line nearly parallel to complainant's road, and not far from it.

The prayer for relief is, that the Indianapolis and St. Louis Company be required specifically to perform its obligations in all the respects mentioned, and that, in default thereof, the guaranteeing defendants be required to do so, and that the latter companies be required to perform, by paying such of the instalments of minimum rent as the lessee company fails to do as they fall due; that the companies be enjoined from receiving from the Indianapolis and St. Louis Company interest on its bonds held by them while it is in arrears for rent, and also enjoined from selling these bonds; and that a receiver be appointed to take such a per cent. of the gross earnings of the company as may be necessary to pay the rent due complainant.

We have been thus minute in showing the breaches of the contract alleged in the bill, the condition of the parties as to ability to perform, and the relief sought, because it is said that an action at law for the unpaid rent, as often as the instalments become due, is an adequate remedy, and is all that the defendants are liable for. But we cannot concur in this view of the matter.

If the contracts are valid contracts, and the complainant has the rights which are guaranteed to it under them, such relief is very inadequate. To sue for every monthly instalment of rent, even if the principal and the guarantors can be sued jointly, is almost equivalent to a denial of justice. If the contract is to continue and the road to be run by the lessee company, which is insolvent, a monthly resort to a suit at law against the guarantors is destructive of the substantial right of the plaintiff under the contract. Having a valuable contract in regard to the operation of the road for a great many years to come, plaintiff cannot be compelled to forfeit it and resume possession and sue for all its damages in one action, because this would best serve the purposes of the solvent guarantors.

The Indianapolis and St. Louis Company agreed to keep the road, its rolling stock, and its equipment in good condition, equal to a first-class western railroad. The plaintiff has a right to have this done specifically, and is not bound to bring action after action for damages at every stage of this depreciation. These suits would be vexatious, unsatisfactory, expensive, and the relief would be inadequate.

A clause in the contract requires the lessee to keep regular accounts of all the matters essential to complainant's rights. The examination of these accounts by a master is eminently appropriate, rather than by a jury. The relief granted by the decree, of enjoining the guaranteeing companies from collecting the interest on the bonds of the Indianapolis and St. Louis Company while it is insolvent and in arrears, can only be given in a court of equity.

In short, the numerous questions, the complex issues, raised in the case can only be satisfactorily tried in a court of equity, and that court alone can give full, adequate and complete remedy for the grievances of plaintiffs growing out of the violation of this contract, and adjust the extent and nature of that relief among the parties to it.

We are of opinion, therefore, that if the complainant is entitled to any relief on the facts of the case, it is in a court of equity as distinguished from a court of law.

3. It is objected that the contract of lease between the two primary parties to that contract, the lessor and the lessee company, was one which they had no power to make, and that, still less, had the other defendant companies authority to guarantee its performance by the latter.

In the consideration of this question no reference will be had to any want of regularity in the proceedings attending the execution of these agreements, nor to the absence of any such authority as the boards of directors could have given to the officers of the companies who signed the contracts. It is here a question pure and simple as to how far the authority to execute these contracts is sustained by the corporate powers which the law has vested in these companies.

A case very much like the present one, as it relates to this

point, was before us some six years ago, and the opinion in it establishes for this court the main principles on which the inquiry must proceed.

In that case a railroad company in New Jersey had leased its road, franchises, and property for a period of twenty years, yielding as in this case complete control of it all to the lessees, and receiving as rent one half the gross sum collected by the lessees from the operation of the road. The agreement contained a condition that the railroad company might at any time terminate the contract and take possession of its property : but in that event they should pay to the lessees the value of the lease for the remaining period of the twenty years to which the lease extended. The company exercised this option, took possession of its road, and the suit was brought to recover on this covenant. *Thomas* v. *Railroad Company*, 101 U. S. 71.

The decision turned upon the power of the company under its corporate authority to make the lease. The plaintiffs in error, who were the lessees, insisted that a corporation may, as at common law, do any act which is not either expressly or impliedly prohibited by its charter, although, where the act is unauthorized, a shareholder may enjoin its execution, and the State may, by proper process, forfeit the charter. To this the court responded :

" We do not concur in this proposition. We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such and such only as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others."

The reports of decisions in the English courts were very fully examined, as will be seen by the reported statement of counsels' briefs, and many of them specially referred to in the opinion; also several cases in this court and in the State courts of this country.

It is not expedient here to go again over the ground there

considered, as we are of opinion now, as we were then, that the great preponderance of judicial decisions supports the proposition above stated.

It has been distinctly recognized, and repeated in this court in the case of the *Green Bay & Minnesota Railroad Co.* v. *Union Steamboat Co.*, 107 U. S. 98.

It is cited with approval in the Supreme Court of Massachusetts in the case of *Davis* v. *Old Colony Railroad Co.*, 131 Mass. 258.

This latter opinion is a very full and able review of all the important decisions on that subject, and sustains very clearly the main propositions.

In this court the principle is completely covered by the decision of the case of *Pearce* v. *Madison & Indianapolis Railroad Co.*, 21 How. 441, decided in 1858. In that case the defendant companies, whose road at one end of it terminated on the Ohio River, had purchased a steamboat to be used on that river in connection with their freight and passenger traffic, and had given notes for the purchase money. In a suit on these notes this court ruled that they were void for want of any authority in the companies to buy the boat, or to engage in the carrying trade on the river.

The opinion delivered by Mr. Justice Campbell cites several of the English cases relied on in *Thomas* v. *Railroad Co.*, and in *Davis et al* v. *Old Colony Railroad Co.*, above referred to, and concludes with the observation that "the opinion of the court is, that it was a departure from the business of the corporation, and that their officers exceeded their authority." This doctrine had been previously asserted with great force in the case of *New York & Maryland Line Railroad Co.* v. *Winans*, 17 How. 30.

These are all cases in which railroad companies were parties, and their powers, as regulated by their charters, were the matters mainly considered. There are many other cases of the highest authority where railroad corporations are held to the doctrine laid down in *Thomas* v. *Railroad Co.*, above cited; *Eastern Counties Railway* v. *Hawkes*, 5 H. L. Cas. 331, 371 to 381; *Ashbury Railway Carriage and Iron Co.* v. *Riche*, L. R.

7 H. L. 653; *McGregor* v. *Dover & Deal Railway*, 18 Q. B. 618; *East Anglian Railways* v. *Eastern Counties Railway*, 11 C. B. 775.

We think it may be stated, as the just result of these cases and on sound principle, that unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or any other contract, turn over to another company, for a long period of time, its road and all its appurtenances, the use of its franchises, and the exercise of its powers, nor can any other railroad company without similar authority make a contract to receive and operate such road, franchises, and property of the first corporation, and that such a contract is not among the ordinary powers of a railroad company, and is not to be presumed from the usual grant of powers in a railroad charter.

We must, therefore, proceed to inquire if any such powers have been given to the railroad companies engaged in this transaction.

There is found in the record a copy of an act of the Illinois legislature, approved February 12, 1855, of which the following is the first section:

" SEC. 1. *Be it enacted by the people of the State of Illinois represented in the General Assembly*, That all railroad companies incorporated or organized under, or which may be incorporated or organized under the authority of the laws of this State, shall have power to make such contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof, and also to contract for and hold in fee-simple, or otherwise, lands or buildings in this or other States for depot purposes; and also to purchase and hold such personal property as shall be necessary and convenient for carrying into effect the object of this act."

Though it might be said that this act only authorizes Illinois railroad companies to become lessees, we think it must be conceded that this enactment authorized the St. Louis, Alton and Terre Haute Railroad Company, which we have already said was exclusively an Illinois corporation, to enter into the lease or operating contract found in the record.

But if the other party to the contract, the Indianapolis and St. Louis Company, had no such authority, the contract of lease is void as to it, and if the other companies had no power to guarantee its performance, it is void as to them, and the capacity of the complainant to make this contract does not make it valid as against those which had not such capacity, and cannot give a right of action on it against them. In the case of *Thomas* v. *The Railroad Company*, the lessees were natural persons with no disability to contract, but they were held to have no remedy on their contract, because it was not binding on the other party for want of a similar power to make the contract.

An act of the legislature of Indiana of December 18, 1865, is relied on as by implication conferring this power. Section 8 is as follows :

" SEC. 8. In case any railroad or part thereof shall have been, or shall hereafter be leased, conveyed, or mortgaged to any other railroad company, and shall be in the possession of such other company, under such lease, conveyance, or mortgage, the road, or part thereof, so leased, conveyed, or mortgaged, shall, during the continuance of such possession, be assessed, for taxation, as the property of the company having such possession, in the same manner as if it were a part of the road of such lessee, grantee, or mortgagee, under its own charter ; and such lessee, grantee, or mortgagee, shall, during the continuance of such possession, have all the rights and be subject to all the duties and liabilities in relation to the road, or parts thereof, so held, which are created by this act, and both its property and the road, or parts thereof, so held, with its fixtures and the property used in operating the same, shall be liable for the payment of such taxes, in the same manner as railroad property is, in other cases, made liable for taxes properly assessed against the same." 3 Ind. Stat., Davis' Ed. (1870), 420, 421.

It will be seen at once that this is a statute for the collection of revenue, and that to make sure of the payment of taxes due on railroad property the legislature has undertaken to provide that in cases where the possession has passed out of the corporation which owns it or has the title, it shall be paid

by the persons having that possession. Hence, in enumerating this latter class it speaks of property leased then or thereafter, or conveyed or mortgaged, and makes the holder liable during the continuance of such possession for the taxes.

This precise question, only more strongly presented, in favor of the affirmance of the lease by the act of the New Jersey legislature, was decided in *Thomas* v. *Railroad Co.*, 101 U. S. 85. The statute in that case having direct relation to the company which had made the invalid lease, passed after the lease was made and in operation, declared it should " be unlawful for the directors, lessees, or agents of said railroad to charge more than three cents per mile for carrying passengers," and the proviso said " that nothing contained in this act shall deprive the railroad company or its lessees of the benefit of the provisions of another act," relative to fares on other railroads in the State.

This court said that, though " it might be fairly inferred that the legislature knew that the road was operated under the lease in that case, it was not important for the purpose of that act to decide whether this was done under a lawful contract or not." " The legislature was determined that whoever did run the road, and exercise the franchises conferred on the company, and under whatever claims of right this was done, should be bound by the rates of fare established by that act. . . . It is not by such an incidental use of the word lessees, in an effort to make sure that all who collected fares should be bound by the law, that a contract unauthorized by the charter and forbidden by public policy is to be made valid and ratified by the State."

So here the mention of lessees as possible holders of the possession of railroad property neither implies that they are lawfully so, or that such an absolute transfer of road, appurtenances, franchises, powers, and their control as the one found in this case, is authorized by law, nor, though it may be in operation, does it give sanction to or create such a law.

The following section of the act of February 23, 1853, of the Indiana legislature is relied on as authorizing this contract:

" SEC. 3. Any railroad company heretofore organized or

which may hereafter be organized under the general or special laws of this State, and which may have constructed or commenced the construction of its road, so as to meet and connect with any other railroad in an adjoining State at the boundary line of this State, shall have the power to make such contracts and agreements with any such road constructed in an adjoining State, for the transportation of freight and passengers, *or for the use of its said road,* as to the board of directors may seem proper." Rev. Stat. Ind. 1881, § 3973.

We cannot see in this provision any authority to make contracts beyond those which relate to forwarding by one company the passengers and freight of another, on terms to be agreed on, and possibly for the use of the road of one company in running the cars of the other over it to its destination without breaking bulk.

In the case of the *Board of Commissioners of Tippecanoe County* v. *Railroad Co.,* 50 Ind. 85, 110, this same statute was relied on as supporting the authority to make the lease then under consideration. But the Supreme Court of Indiana said: "That act is, 'to authorize railroad companies to consolidate their stock with the stock of other railroad companies in this or in an adjoining State, and to connect their roads with the roads of said companies.' The title nowhere mentions a lease or a sale. Indeed, the words to connect their roads with the roads of other companies, would seem to exclude such a conclusion. To connect one road with another does not fairly mean to lease or sell it to another."

This was said in a case where the whole question turned on the power of one railroad company to make, and the other to receive, a lease of the road.

It is cited in the brief of counsel for complainant as sustaining the doctrine that in Indiana the right of railroad companies to lease their roads to other companies is recognized by the judiciary of that State. We think it proves the opposite. The lease in that case was held void as being *ultra vires.* All the arguments of the court are based on the proposition that the corporation can do no valid act unauthorized by statute, and can make no contract in contravention of public

policy. And while it says, "We do not decide that railroad companies cannot become lessors or lessees of other railroad companies, for the purpose of running their lines in conjunction, facilitating commerce, travel, and transportation, or for any legitimate purpose for which railroad companies are organized, and there is much in the legislation of the State favoring this view, and many decisions sustaining the advancing enterprise of the country," it adds: " But all such contracts must come within the powers of the corporation, must not exceed the powers of the agency that makes them, must not violate the rights of stockholders or contravene public policy." We look in vain in this latest decision of the State for any assertion of the proposition that, by the laws of that State or by the decisions of its courts, there exists any law by which one railroad company can, by lease or by any other contract, make an absolute surrender of its road and its franchises to another. And yet that was the question under discussion, and because the lease in that case contained a clause of perpetual renewal, and in effect amounted to a sale, the court held it *ultra vires*. What practical difference is there between this and a lease with the same powers for ninety-nine years?

If that decision does no more, it at least leaves this court free to follow its own views of the powers conferred by the Indiana law in regard to this subject on its railroad corporations.

Lastly, it is said that in *Railroad* v. *Vance*, 96 U. S. 450, this court decided that this same contract was binding on the Indianapolis and St. Louis Company.

That was done on the ground that the latter company was made a corporation of the State of Illinois by the act of that State of March 11, 1869, and was using that part of the present plaintiff's road lying within the State of Illinois, under that contract. In reference to its liability to pay the taxes on that part of the plaintiff's road, it was held to be an Illinois corporation, and bound under the Illinois statute by the contract of lease now under consideration.

But we have just shown that the Indianapolis and St. Louis Company was an Indiana corporation when this contract of lease was made, which was two years before it became an Il-

linois corporation by the act of 1869. The present suit is against it as an Indiana corporation, otherwise it could not be maintained. The validity of the contract depends on its power as an Indiana corporation to make it at the time it was made. It had none then, and no act of the Indiana legislature has ratified it since. That suit was founded on an Illinois contract between Illinois corporations to collect Illinois revenue, and was in no sense governed by Indiana law, but by the law of Illinois.

As regards this lease in a suit against the Indiana corporation, organized under its laws by the name of the Indianapolis and St. Louis Railroad Company, in the Circuit Court of the United States for that District, we must hold it to be void for want of power in the defendant company to make it.

We have been thus careful in our examination into the power of the lessor and lessee companies in the contract of lease, because if the lease itself is void the contract of the other companies must be equally so. A contract to perform for the Indianapolis and St. Louis Railroad Company obligations which it was forbidden to assume, and which it had no authority to assume, must itself be void. There is no power shown in any of these companies to accept a lease of the complainant such as the one in the present case, and perform its conditions, and they cannot, therefore, become parties to such a contract with a road outside the State which chartered them any more than the principal company. If these guaranteeing companies had executed the original contract of lease it would have been void for want of authority from the legislature of Indiana, or of any other State by whose laws they are incorporated or endowed with corporate power. No such power is shown in them to lease roads beyond their own States.

Indeed, while there may be a just claim of authority for some kind of running arrangement between two connecting roads under the Indiana statutes, there is no connection between the plaintiff's road and any road of a guaranteeing company. The connection even by traffic is remote. These companies might as well have assumed the power to loan them money, or to endorse their notes, or any other commercial transaction, as to

guarantee the performance of a void contract by one company to another.

It may not be amiss to cite one or two cases in which this power to guarantee the contract of one corporation by another is more directly in point. Among these are *Coleman* v. *Eastern Counties Railway Co.* 10 Beav. 1; *Madison & Watertown Plank Road Co.* v. *Watertown & Portland Plank Road Co.*, 7 Wis. 59.

In the first of these cases, under the powers contained in the acts of Parliament, the Eastern Counties Railway Company and the Eastern Union Railway Company had formed a railroad from London to Manningtree, a place about ten miles from the port of Harwich. The directors of these companies conceived that it would add to the traffic and profits of the railway if a steam packet company could be formed communicating between Harwich and the northern ports of Europe, and they accordingly took proceedings for the establishment of such a company. It was intended that the railway companies should guarantee to the shareholders in the steam packet company a dividend of five per cent. per annum upon their paid-up capital until the dissolution of that company, and that then the whole paid-up capital should be paid by the railway companies to the shareholders of the packet company in exchange for a transfer of its assets.

On a bill by a shareholder of the railway company to enjoin, it was held by the Master of the Rolls, Lord Langdale, that no such contract was within the power of the railway companies, and further proceedings in the matter were enjoined.

Among other things, that learned judge said that, "if there is one thing more desirable than another, after providing for the safety of all persons travelling on railroads, it is this, that the property of the railway companies shall be itself safe; that a railway investment shall not be considered a wild speculation, exposing those engaged in it to all sorts of risks, whether they intended it or not. Considering the vast property which is now invested in railways, and how easily it is transferable, perhaps one of the best things that could happen would be that the investment should be of such a safe nature that

prudent persons might without improper hazard invest their moneys in it. Quite sure I am that nothing of that kind can be approached if railway companies should be at liberty to pledge their funds in support of speculations not authorized by their legal powers, and which might very possibly, to say the least, lead to extraordinary losses on the part of the railway company." This became a leading case in England, where its doctrines have been steadily followed. It is cited with approval in *Pearce* v. *Madison & Indianapolis Railroad Co.*, 21 How. 441.

In the case of *Madison Plank Road Co.* v. *Watertown Company*, 7 Wis. 59, the former company, in order to aid the latter company to build a plank road, which was a continuation of the road of the former, agreed to guarantee a loan made to the Watertown Company. After the road was built the Madison Company refused to pay on the default of the Watertown Company. The Supreme Court held that the Madison Company had no corporate power to guarantee the payment of the debt of the other company ; and, when pressed with the argument that, by the building of the road, the Madison Company had received the benefit which had induced it to guarantee the debt, the court said it was a contract *ultra vires* and could not be enforced.

We are of opinion that the guarantee of the obligations of the lease on the part of the Indianapolis and St. Louis Company by the other defendants is void.

4. It is argued, in support of the decree, that, though the contract of lease may be void, so that no action could originally have been sustained upon it, there has been for ten years such performance of it, in the use, possession, and control of plaintiff's road and its franchises, by the defendants, that they cannot now be permitted to repudiate or abandon it : that it now presents one of a class of cases which hold that where a void contract has been so far executed that property has passed under it and rights have been acquired under it, the courts will not disturb the possession of such property or compel restitution of money received under such a contract.

Undoubtedly there are such decisions of courts of high

authority, and there is such a principle, very sound in its application to appropriate cases. But we understand the rule in such cases to stand upon the broad ground that the contract itself is void, and that neither what has been done under it, nor the action of the court, can infuse any vitality into it. Looking at the case as one where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands. We know of no well considered case where a corporation, which is party to a continuing contract which it had no power to make, seeks to retract and refuses to proceed further, can be compelled to do so. As was said in *Thomas* v. *Railroad Co.*, (a case so often in point here,) " having entered into the agreement it was the duty of the company to rescind or abandon it at the earliest moment. This duty was independent of the clause in the contract which gave them the right to do it. Though they delayed its performance for several years, it was nevertheless a rightful act when it was done. Can this performance of a legal duty, a duty both to stockholders of the company and to the public, give to plaintiffs a right of action ? Can they found such a right on an agreement void for want of corporate authority and forbidden by the policy of the law ? To hold that they can is, in our opinion, to hold that any act performed in execution of a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts." 101 U. S. page 86.

Whatever may be said in regard to the Indianapolis and St. Louis Company, there is wanting in the case of the guaranteeing companies one of the strongest reasons usually urged in support of the estoppel, as it is sometimes called, namely, that the recalcitrant party has received the money or the property of the other. For, so far from these guaranteeing companies having received of the plaintiffs any money or property, they are the parties who have been paying money and the plaintiffs receiving it for rent of its road. They are not, therefore, estopped

on any principles of that doctrine from ceasing to pay money on an illegal contract because they have heretofore done so. On the contrary, as we have already said, the duties of these directors to their stockholders is to cease to perform a contract to which they were never bound.

We do not decide the question whether the Indianapolis and St. Louis Railroad Co. cannot be compelled to pay the plaintiff for the use of its road, though the contract be void. Whether it would be so liable on a *quantum meruit* admits of doubt. It is unnecessary to decide this, because that company has submitted to the decree of the Circuit Court in favor of plaintiff for that rent, by failing to give bond and perfect its appeal from that decree.

> *That part of the decree [which requires the Indianapolis and St. Louis Railroad Company to pay rent] must stand, as no appeal from it has been prosecuted. The decree against the other defendants, appellants here, is for the reasons given reversed, and the case remanded to the Circuit Court with directions to dismiss the bill as to them.*

MR. JUSTICE BRADLEY, with whom concurred MR. JUSTICE HARLAN, dissenting.

I dissent from the judgment of the court in this case, and will very briefly state my reasons for dissenting.

The St. Louis, Alton and Terre Haute Railroad Company, the lessor, had full authority to make the lease of its road and works which is brought in question in the cause. The Indianapolis and St. Louis Railroad Company, the lessee, assumed to have power to take the lease, and had such power in Illinois by the effect of the laws of that State, and was supported in its assumption of power by the implications of several statutes of Indiana. If these implications were not sufficiently strong to amount to a grant of power, still, they were sufficient to show that the legislature of Indiana understood the power as existing and acquiesced in it. The other railroad companies, parties to the suit, who guaranteed the performance of the lease and its covenants on the part of the lessee, had the power to do so by the laws of Illinois, and the engagement of guaranty on

their part was a contract entered into by them in furtherance of their through business to and from St. Louis and the States west of the Mississippi. The whole arrangement, in fact, was devised by them for the purpose of facilitating and increasing their business as integral parts of great trunk lines, which, in the absence of inter-State regulations of commerce made by Congress, are of the greatest utility to the business of the country.

To hold that the railroad companies of the country thus situated cannot, without acting *ultra vires*, make business arrangements beyond the limits of their own tracks in a country situated and divided up into States as ours is, it seems to me is to take a very contracted view of the powers and duties of these public institutions. According to the doctrine of the court, a New York or Pennsylvania company could not even have a ticket or freight agent in St. Louis for the purpose of soliciting freight and passengers to be carried on the trunk line of which it forms a part. They could not hire an office for such an agent, or, if they did, they could not be held responsible for the rent. This is carrying the doctrine of *ultra vires* to what seems to me an absurd extent. It is following out the English notions on that subject, which always seemed to me inapplicable to our situation and circumstances, however well suited to that compact and homogeneous country—homogeneous in government and jurisdiction. All the principal railroads in England extend across the entire country from London, in different directions, to the sea. In this country, as Congress declines to charter through lines across the States, the State governments themselves charter local roads, limited by the boundary lines of the State. In order to give the country through facilities at all, these State roads are obliged to unite their lines, and make what is called a trunk line. The necessities of the country require it. Yet, according to the logic of the decision in this case, this is all *ultra vires*.

Look at it. One of our great trunk lines, extending from West to East, is composed (say) of five connected railroads, forming together a continuous line, working together under a contract which regulates their mutual rights and obligations

in the management of the business and the ·distribution of its joint receipts. All this is *ultra vires* and void! One of the links of the chain is a ferry which, in consideration of extra accommodations afforded for the business of the line, is guaranteed a certain sum *per annum*. The guaranty is *ultra vires* and void!

Is this law? It may be English law; but is it American law? I cannot believe it. We must not shut our eyes to the fact that new circumstances and conditions, of themselves, require and produce a modification of old rules, or the application of new ones.

This narrow doctrine has already been discarded by the courts, and by this court. It has become settled law, that a railroad company at one end of a trunk line may enter into contracts for the transportation of passengers and goods to any part of the line, hundreds of miles beyond its own track; and will be held liable for the fulfilment of such contracts. And yet, according to the doctrine of the opinion in this case, this is *ultra vires*.

But this is not all. The contract has been performed on the part of the lessor company, and the lessee and its guarantors have enjoyed the benefit of it. With what face can they now refuse to pay what they agreed to pay? With what face can they plead incapacity to contract? This is not a suit to compel the specific performance of the contract in future; but to compel the payment of the money earned by past performance of the contract. It seems to me that the companies concerned are estopped to deny their liability to make this payment. It is the companies themselves who make the plea, not their stockholders.

In several national bank cases, where the banks have loaned money on mortgages of land, contrary to the express prohibition of the act of Congress, and *ultra vires*, we have enforced the contract, leaving it to the government to call the banks to account for acting outside of their chartered powers.

Why should·not the same rule be applied to railroads, if it is thought they have exceeded their powers; especially when no stockholder complains of the company's action, and the ob-

ject of the suit is, to compel them to pay for a benefit actually received.

In every aspect in which the case can be viewed, it seems to me that the decree of the Circuit Court was not only just and right, but in accordance with sound principles of American law, and ought to be affirmed.

I am authorized to say that MR. JUSTICE HARLAN agrees with me in opinion.